IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

CENTRAL WEST VIRGINIA ENERGY
COMPANY, INC., et al.,

                Plaintiffs,

v.                                 CIVIL ACTION NO.  5:09-cv-00467

MOUNTAIN STATE CARBON, LLC, et al.,

                Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant OAO Severstal's motion to dismiss the Third Amended Complaint [Docket 103] and Defendant Severstal Wheeling, Inc. and Defendant Severstal North America, Inc.'s joint motion to dismiss Counts VI and VII of the Third Amended Complaint [Docket 105].

For the reasons that follow, the Court **DENIES** Defendant OAO Severstal's motion to dismiss and **DENIES** Defendant Severstal Wheeling, Inc. and Defendant Severstal North America's joint motion to dismiss Counts VI and VII.

Also pending are three renewed motions to dismiss the Second Amended Complaint by former defendant SNA Carbon, LLC, Defendant Severstal North America, Inc., and Defendant OAO Severstal [Docket 85, 87, & 89].  Because these motions relate to the Second Amended Complaint and because SNA Carbon, LLC, is no longer a party to this suit, these motions are **DENIED AS MOOT**.

## I.  BACKGROUND

### A.    The Parties

This dispute arises from an alleged breach of a coal supply contract.  Plaintiff Central West Virginia Energy Company ("CWVEC") is a Boone County, West Virginia, company engaged in the business of selling metallurgical quality coking coal.[1]  Plaintiff Appalachia Holding Company ("AHC") is a coal mining company based in Richmond, Virginia, which sells coal to CWVEC. Defendant Mountain State Carbon, LLC ("MSC") is a Delaware limited liability company engaged in the business of manufacturing coke at its Follansbee, West Virginia, plant.  MSC supplies coke to MSC's parent corporation, Defendant Severstal Wheeling, Inc. ("Severstal Wheeling") and to affiliated entities "owned and controlled by" Defendant Severstal North America, Inc. ("Severstal North America"). (Docket 97, ¶ 4.)  Severstal Wheeling is a Delaware corporation based in Dearborn, Michigan and is a wholly-owned subsidiary of Defendant Severstal North America. Defendant MSC has no employees. As a limited liability company, MSC is organized and managed by its members. W. Va. Code § 31B-1-101, *et seq.*  MSC has two members, former defendant SNA Carbon, a shell company formed to hold 50% of Defendant Severstal North America's interest in MSC, and Defendant Severstal Wheeling.  MSC's Follansbee plant is "managed and operated exclusively by employees of Severstal Wheeling and/or Severstal [North America]." (*Id.*, ¶ 5.) Defendant OAO Severstal ("Severstal Russia") is a Russian steel conglomerate that is the fourth largest integrated steel company in the United States and the largest Russian steel producer.

---

[1] Unless otherwise noted, the factual background set forth here is derived from Plaintiffs' Third Amended Complaint.

Beginning in 2005, Defendant Severstal Russia began acquiring steelmaking assets in the United States. Severstal Russia "exercises complete control and dominion over the affairs" of Severstal North America including "the price for commodities and the determination of operating budgets." (*Id.* ¶ 20.) Severstal North America, in turn, "exercises complete control and dominion over the affairs" of Severstal Wheeling and MSC, including setting the price that MSC will pay for coal, determining the amount and scheduling of coal delivered to MSC, the amount of coke MSC produces and ships, and determining capital expenditures for the maintenance of MSC's facilities. (*Id.*). The Severstal Defendants[2] "make all corporate decisions relating to [MSC's] business operations, including its performance under the Coal Supply Agreement," and these decisions are made or implemented by Severstal Wheeling and its officers and employees." (*Id.,* ¶ 5.)

B. *The Coal Supply Agreement*

Because metallurgical quality coal is used in steelmaking and because it is in short supply, United States steelmakers enter into long-term, fixed price contracts to ensure a steady and reliable supply. In 1993, Plaintiff CWVEC and Wheeling Pittsburgh Steel Corporation ("Wheeling Pitt") entered into such an agreement. Pursuant to their Coal Supply Agreement, CWVEC agreed to supply, and Wheeling Pitt agreed to purchase from CWVEC, one hundred percent of the metallurgical coal requirements of its Follansbee, West Virginia plant operations, limited only by the "capacity of Wheeling Pitt's facilities existing as the date of the Coal Supply Agreement. . . ." (*Id.* ¶ 27.) In 2002, an amendment to the Coal Supply Agreement extended the contract's term seven years and specified that each contract year ran from November 1st to October 31st. When MSC took

---

[2] Collective reference to the "Severstal Defendants" in this Memorandum Opinion means Defendants Severstal Wheeling, North America, and Russia.

over Wheeling Pitt in 2005, MSC assumed Wheeling Pitt's interest in the Coal Supply Agreement and took ownership of the Follansbee plant.

Under the Coal Supply Agreement, MSC was required to advise CWVEC prior to each contract year of MSC's annual coal requirements. Once those requirements were identified, MSC was obligated to accept not less than 95% and not more than 105% of the stated annual requirements. MSC, with written notice to CWVEC ninety days in advance of each quarter, could allocate or "nominate" its coal requirements across the four quarters of each contract year. If MSC failed to provide notice of nominated quarterly amounts, then the nominated amount for that quarter, under the contract, would be deemed to be the amount for the preceding quarter. CWVEC was required to deliver, and MSC was required to accept, not less than 90% and not more than 110% of the quarterly nominations. According to the Complaint, "the Defendants" were aware that Plaintiffs relied on MSC's annual coal requirements when preparing their annual operating budgets and generally managing their business operations. MSC's notification of its annual coal requirements and its quarterly nominations were "critical" to the Plaintiffs' business operations in that, without proper notice, Plaintiffs' production, delivery, and transportation schedules would be adversely affected, as would Plaintiff AHC's production forecasting for future contract years. (*Id*. ¶ 41.) Plaintiffs allege that "Defendants, at all times relevant thereto, knew or should have known" of these matters. (*Id*.)

C.    *Alleged Violations of the Coal Supply Agreement*

In the first half of 2008, demand for metallurgical steel sharply rose, but in August 2008, orders for steel products plummeted. Plaintiffs allege that "[i]n or about June and July 2008, MSC was notified by its parent and affiliate companies that orders for steel products appeared to be

declining or were about to decline precipitously." (*Id.* ¶¶ 42-43.) The drop in steel orders caused "widespread concern and fear within the Severstal empire" of industry collapse and prompted an emergency meeting in September 2008. (*Id.* ¶¶ 43, 46.)  The meeting was held in the United States. In attendance were Severstal Russia's chief operating officer and the vice presidents and managers of each of Severstal North America's operations, including the corporate officers of Defendant Severstal North America. The attendees were advised that the downturn in the steel market was expected to last at least nine months and that the future of Severstal North America's operations was in peril.  By late October 2008, the outlook for the steel market and Severstal's North American operations remained bleak. Consequently, "top executives" developed cost-cutting business plans to save Severstal's North American operations.

Defendants did not communicate with Plaintiff CWVEC about these events or their business troubles and concerns.  MSC failed to provide timely notice to CWVEC of MSC's coal requirements for the first quarter of 2009; consequently, under the terms of the Coal Supply Agreement, that quarter's allotment was deemed to be the amount allotted for the last quarter of 2008.  The Severstal Defendants "directed [MSC] to notify [CWVEC] that it was unilaterally reducing the amount of coal that it would accept for delivery during the first quarter of the 2009 Contract Year, despite the fact that under the terms of the Coal Supply Agreement the amount to be delivered and accepted during that quarter had been set on or about August 3, 2008." (*Id.* ¶ 50.)  Additionally, by letter dated October 31, 2008, Defendant MSC, as instructed by Severstal Russia and Severstal North America, wrote CWVEC  giving notice that it required 1,128,000 tons of coal for contract year 2009, and that it only required 228,000 tons for the first quarter of 2009.  Because this notification of MSC's first quarter needs was allegedly untimely under the Coal Supply Agreement, MSC deemed the first

quarter of 2009 tonnage requirement to be the same as the preceding quarter.  Similarly, Plaintiffs contend that MSC failed to provide timely notice of any change to the nominated amount for the second quarter of 2009 and, thus, the amount for the second quarter was deemed the same as for the first quarter of 2009. On January 30, 2009, MSC advised CWVEC, that it wished to reduce the quantity of coal it was obligated to take for the second quarter of 2009.  CWVEC, however, deemed that request untimely since it was not made at least ninety days in advance of the start of the second quarter, that is, February 1, 2009.

Because Defendant MSC had stated its third quarter requirements in its January 30, 2009, correspondence, that quarter is not an issue in this case; the last quarter of the 2009 contract year, however, is an issue.  In a letter dated April 30, 2009, MSC advised CWVEC that it was nominating "zero" tons for the fourth quarter.  CWVEC deemed that nomination "contractually ineffective" because MSC failed to accept delivery of at least ninety-five percent of the requirements it specified (1,128,000 tons) for the 2009 contract year. MSC's actions are alleged to have been "taken by and through" all three Severstal Defendants. (*Id.*, ¶ 66.)  Plaintiffs claim that MSC's failure to accept the delivery of coal was part of an effort by the "Defendants" to shift the economic burdens created by the depressed steel market onto the Plaintiffs, "their miners, pensioners, and bondholders—many of whom are situated in Raleigh County and throughout southern West Virginia" (*Id.* ¶ 67.)

D.     *Causes of Action*

Counts I through IV take aim at MSC.  These counts allege: Count I, breach of implied duty of good faith and fair dealing; Count II, breach of contract relating to MSC's alleged failure to take delivery of its obligated annual amount of coal for all of 2009; Count III, promissory estoppel; and

Count IV, breach of contract relating to MSC's alleged failure to accept delivery of at least ninety percent of the nominated amounts for each quarter of the 2009 contract year.

Counts V through VII focus on the Severstal Defendants. Count V, breach of contract by Defendant Severstal Wheeling and Defendant Severstal North America (on the theory that if Plaintiffs are unable to recover from MSC, Plaintiffs will look to Severstal Wheeling as a guarantor of MSC's obligations); Count VI, breach of contract by all three Severstal Defendants acting as alter egos of MSC; and Count VII, tortious interference by all three Severstal Defendants (pleaded as an alternative claim to the alter ego theory of recovery).

## II.  LEGAL STANDARDS

Defendant Severstal Russia seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2) of Counts VI and VII claiming the Court may not exercise personal jurisdiction over it (Docket 103).  Severstal Russia seeks, alternatively, dismissal of these Counts pursuant to Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim.  Defendants Severstal Wheeling and Severstal North America do not challenge personal jurisdiction over them.  Rather, they limit their joint motion to dismiss Counts VI and VII to an assertion of failure to state a claim under Rule 12(b)(6).  (Docket 105.)

A.    *Defendant Severstal Russia's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2) for Lack of Personal Jurisdiction*

Where a defendant challenges a court's power to exercise personal jurisdiction pursuant to Federal Rule of Civil Procedure  12(b)(2) , "the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs.,* Inc., 334 F.3d 390, 396 (4th Cir.

2003) (citing *Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 59-60 (4th Cir.1993)).   In assessing the

question of personal jurisdiction to hear a case on a motion to dismiss, a district court may consider

affidavits.  *In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997).

When, however, as here, a district court rules on a Rule 12(b)(2) motion without conducting

an evidentiary hearing and relies solely on the complaint and affidavits, "the burden on the plaintiff

is simply to make a *prima facie* showing of a sufficient jurisdictional basis in order to survive the

jurisdictional challenge." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).   In considering a

challenge on such a record, the court must construe all relevant pleading allegations in the light most

favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the

existence of jurisdiction." *Id.*   The allegations of the complaint, except insofar as controverted by

the defendant's affidavit, must be taken as true.   *Wolf v. Richmond Cty. Hosp. Auth.*, 745 F.2d 904,

907 (4th Cir. 1984) (citing *Black v. Acme Markets, Inc.*, 564 F.2d 681, 683, n.3 (5th Cir. 1977)).[3]

"In order for a court to validly exercise personal jurisdiction over a non-resident defendant:

(1) a statute must authorize service of process on the non-resident defendant, and (2) the service of

process must comport with the Due Process Clause." *Celotex*, 124 F.3d at 627 (citing *Mylan Labs.,*

2 F.3d at 60).   Because the West Virginia long-arm statute is coextensive with the full reach of due

process, the statutory inquiry in this case will necessarily merge with the constitutional inquiry.   *Id.*

West Virginia's long-arm statute permits West Virginia courts to assert personal jurisdiction

over persons who, *inter alia*, transact business, contract to supply services or things, cause tortious

injury, or have an interest in, or use or possess any real property in the state.   Personal jurisdiction

---

[3] *Wolf* was decided prior to the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662,
___, 129 S. Ct. 1937, 1949 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

also extends to persons who cause tortious injury in the state by acts or omissions outside the state if the defendant regularly does business or engages in any other persistent course of conduct in the state, or derives substantial revenue from goods used or services rendered in the state.[4]

In determining whether the exercise of personal jurisdiction comports with due process, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985), "such that

---

[4] West Virginia Code § 56-3-33(a) provides:

The engaging by a nonresident, or by his or her duly authorized agent, in any one or more of the acts specified in subdivisions (1) through (7) of this subsection shall be deemed equivalent to an appointment by such nonresident of the Secretary of State, or his or her successor in office, to be his or her true and lawful attorney upon whom may be served all lawful process in any action or proceeding against him or her, in any circuit court in this state, including an action or proceeding brought by a nonresident plaintiff or plaintiffs, for a cause of action arising from or growing out of such act or acts, and the engaging in such act or acts shall be a signification of such nonresident's agreement that any such process against him or her, which is served in the manner hereinafter provided, shall be of the same legal force and validity as though such nonresident were personally served with a summons and complaint within this state:

(1)     Transacting any business in this state;
(2)     Contracting to supply services or things in this state;
(3)     Causing tortious injury by an act or omission in this state;
(4)     Causing tortious injury in this state by an act or omission outside this state if he or she regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;
(5)     Causing injury in this state to any person by breach of warranty expressly or impliedly made in the sale of goods outside this state when he or she might reasonably have expected such person to use, consume or be affected by the goods in this state: Provided, That he or she also regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;
(6)     Having an interest in, using or possessing real property in this state; or
(7)     Contracting to insure any person, property or risk located within this state at the time of contracting

the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' embodied in the constitutional principles of due process." *Fed. Ins. Co. v. Lake Shore Inc.,* 886 F.2d 654, 658 (4th Cir. 1989) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945)). "The minimum contacts test requires a plaintiff to show that a defendant purposefully directed his activities at the residents of the forum and that the plaintiff's cause of action arises out of those activities." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009) (citing *Burger King*, 471 U.S. at 472  (citation and internal quotation marks omitted)).  This showing ensures that a defendant is not "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts," *Burger King*, 471 U.S. at 475, and protects a defendant from having to defend himself in a forum where he should not have anticipated being sued.  *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). "The jurisprudence of minimum contacts has developed as a surrogate for presence in the state because '[a] state's sovereignty remains territorial, and its judicial power extends over only those persons, property, and activities within its borders.'" *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997) (citing  *Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 941-46 (4th Cir.1994)).  The inquiry then is "whether a defendant's contacts with the forum state are so substantial that they amount to a surrogate for presence and thus render the exercise of sovereignty just, notwithstanding the lack of physical presence in the state." *Id.*

The requirement that a non-resident defendant's "minimum contacts" be purposeful is derived from "the basic premise that traditional notions of fair play and substantial justice are offended by requiring a non-resident to defend itself in a forum when the non-resident never purposefully availed itself of the privilege of conducting activities within the forum, thus never

invoking the benefits and protections of its laws." *Celotex*, 124 F.3d at 628 (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The "purposeful" requirement also "helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum." *Id.*

The tests for determining personal jurisdiction over a non-resident defendant depends on whether the defendant's contacts with the forum state provide the basis for the suit. If they do, then they may establish "specific jurisdiction." *Carefirst of Md.*, 334 F.3d at 397. In determining whether specific jurisdiction exists, a court must consider: (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." *Id.* (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711-12 (4th Cir. 2002)). If the defendant's contacts with the state are, however, not the basis for the suit, then a court must determine whether "general jurisdiction" exists. In conducting that inquiry, a court may find that it has general jurisdiction if the defendant's activities were "continuous and systematic." *Id.* "[T]he threshold level of minimum contacts sufficient to confer general jurisdiction is significantly higher than for specific jurisdiction." *ALS Scan,* 293 F.3d at 715 (internal quotation marks omitted).

A court may exercise specific personal jurisdiction over a non-resident defendant acting outside of the forum when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that the conduct would cause harm to a forum resident. *Carefirst of Md.,* 334 F.3d at 398 (citing *Calder v. Jones*, 465 U.S. 783 (1984)). The "effects test" typically requires the plaintiff establish that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt

11

of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity. *Id.* at 398 n. 7.

> B.      *Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) for Failing to State a Claim upon Which Relief May Be Granted*

A pleading that states a claim for relief must, *inter alia*, contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Allegations "must be simple, concise, and direct" and "no technical form is required."  Fed. R. Civ. P. 8(d)(1). The question of whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in Rule 8 (providing general rules of pleading), Rule 9 (providing rules for pleading special matters), Rule 10 (specifying pleading form), Rule 11 (requiring the signing of a pleading and stating its significance), and Rule 12(b)(6) (requiring that a complaint state a claim upon which relief can be granted).  *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009).

A complaint offering "'naked assertion[s]' devoid of 'further factual enhancement' does not satisfy Rule 8's pleading standard."  *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In *Iqbal*, the Supreme Court stated: "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id*. (quoting *Twombly*, 550 U.S. at 555).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal*, at 1949 (quoting *Twombly*, at

570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The plausibility standard is not akin to a 'probability requirement,' but it does ask for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, at 570). The standard requires the plaintiff to articulate facts, when accepted as true, to "state a claim to relief that is plausible on its face." *Id.*  A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that "the defendant is liable for the misconduct alleged." *Iqbal*, at 1949.  In other words, the factual allegations (taken as true) must "permit the court to infer more than the mere possibility of misconduct." *Id.*   Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (citing *Twombly*).  A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible." *Twombly*, at 555, 570.  While a court must accept the material facts alleged in the complaint as true, *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), statements of bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. *Iqbal*, at 1950.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" because courts are not bound to accept as true a legal conclusion couched as a factual allegation.   *Id.* (internal quotation marks omitted); *see also Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009). "Determining whether a complaint

states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, at 1950.

## III.   DISCUSSION

### A.   Defendant Severstal Russia's Motion to Dismiss for Lack of Personal Jurisdiction

Defendant Severstal Russia moves to dismiss under Federal Rule of Civil Procedure 12(b)(2), challenging the Court's power to exercise personal jurisdiction over it.  In support of its argument, Defendant Severstal Russia relies upon the affidavit of Vladmir A. Lukin, a senior vice president of Severstal Russia.[5]  (Docket 33-2.)

In considering Severstal Russia's personal jurisdiction argument, the Court has relied solely on the Third Amended Complaint, the Lukin affidavit, and the briefing of counsel.  No evidentiary hearing has yet occurred.[6]  Thus, the question to be answered at this juncture is not whether Plaintiff has proved  by a preponderance of the evidence that the Court may exercise personal jurisdiction over Defendant Severstal Russia, but rather whether Plaintiffs have made a *prima facie* showing for personal jurisdiction.

---

[5] This affidavit was submitted in connection with Defendant Severstal Russia's motion to dismiss the Second Amended Complaint. (Docket 33.)

[6] The decision to decide the motion in this manner was informed in part by the fact that a determination of the personal jurisdiction question is a fact-laden inquiry that implicates the merits of Plaintiffs' alternative alter ego and tortious interference claims.  In such instances, a decision on personal jurisdiction may be postponed until the merits stage of the case where Plaintiffs will have the burden of proving personal jurisdiction by a preponderance of the evidence. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989) (citing 2A Moore's Federal Practice ¶ 12.16 (1984)); *Hare v. Family Pubs. Serv., Inc.*, 334 F. Supp. 953, 956 (D. Md. 1971) (stating that when the jurisdictional facts are essentially the same as the ultimate facts involved in the merits of the case, it was inappropriate for the court to decide jurisdictional facts on a motion to dismiss because a contrary holding would require a mini-trial solely for jurisdictional purposes in every tort case where personal jurisdiction was predicated on the "tortious injury" prong of Maryland's long-arm statute).

As a preliminary matter, the Court notes that the pleading standards articulated in *Twombly* and *Iqbal* address the sufficiency of the plaintiffs' allegations in support of the substantive claims alleged. Those cases do not address whether their holdings apply to jurisdictional pleading requirements, nor has the Fourth Circuit or any court of appeals to date expressly extended *Twombly* and *Iqbal* to jurisdictional pleading. In *Haley Paint Co. v. E.I. Dupont De Nemours and Co.*, 775 F. Supp. 2d 790, 798-99 (D. Md. 2011), however, the district court concluded that it makes sense to extend the Supreme Court's plausibility pleading requirement to jurisdictional pleading because the language of the procedural rules for pleading claims and jurisdiction is so similar and because the facts for asserting jurisdiction are so often entwined with facts asserting a claim for relief. *Id.; see* Fed. R. Civ. P. 8(a)(1) and (2) (both rules requiring "a short and plain statement"). The Court agrees with the reasoning in *Haley Paint*.

In addition to *Haley Paint's* analysis, a showing of plausibility in jurisdictional pleading makes sense when the concerns that animated *Iqbal* and *Twombly's* heightened pleading standard are remembered: discovery is expensive and plaintiffs should not be able to extort settlements via baseless claims. *Twombly*, 550 U.S. at 558; *Iqbal*, 129 S. Ct. 1945. The Supreme Court emphasized that the plausibility standard does not impose a probability requirement, but "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" to support plaintiff's claim. *Twombly*, 550 U.S. at 544, 556. The Court was concerned that without such a threshold showing, groundless claims would result in expensive discovery and cause "cost-conscious defendants to settle even anemic cases." *Id.* at 559. The Court can discern no persuasive reason why these concerns would not apply with equal force to jurisdictional pleading, which if deficient, will result in early disposition of groundless claims. For these reasons, the Court concludes that the

pleading standards set forth in *Twombly* and *Iqbal* apply to jurisdictional pleading under Federal Rule of Civil Procedure 8(a)(1).

Thus, the question for the Court is whether, construing all relevant pleading allegations in the light most favorable to the Plaintiffs and drawing the most favorable inferences for the existence of jurisdiction, Plaintiffs have made a plausible *prima facie* showing of a basis for exercising personal jurisdiction over Defendant Severstal Russia.

While Plaintiffs filed a response to Defendant Severstal Russia's challenge to the Court's exercise of personal jurisdiction—and at times reference defense affidavits in support of their arguments—they have not supplied the Court with any affidavits of their own or other evidence pertaining to personal jurisdiction.[7]

Count VII is an intentional tort claim. Plaintiffs contend that the Court may exercise specific jurisdiction over Severstal Russia. Employing the effects test, Plaintiffs argue that Severstal Russia committed an intentional tort by intentionally interfering with the Coal Supply Agreement between Defendant MSC and Plaintiff CWVEC, and that the brunt of the harm caused by Severstal Russia's tortious conduct was borne in West Virginia because West Virginia is CWVEC's residence and is where the coal used by MSC is mined. Plaintiffs further contend that Severstal Russia necessarily aimed its tortious conduct at West Virginia because West Virginia is the sole locale implicated and "there could be no other focal point of the tortious activity. . . ." (Docket 119 at 10.)

---

[7] Attached to Plaintiffs' response are two exhibits. (Docket 119-1, 119-2.) These exhibits are a memorandum of law filed by Defendant MSC and a court order from related litigation in state court. Plaintiffs tender these exhibits for the point that Defendants have taken inconsistent legal positions in federal and state court regarding this dispute. Plaintiffs claim that Defendant MSC successfully argued in state court that (as characterized by Plaintiffs) "a parent company is liable for tortious interference when it causes a subsidiary to breach a contract for an improper purpose."

Defendant Severstal Russia argues that "in order to make a *prima facie* showing that personal jurisdiction exists," Plaintiffs must establish that Severstal Russia purposefully established minimum contacts with West Virginia " 'such that [Severstal Russia] should reasonably anticipate being haled into court there.'" (Docket 104 at 7) (quoting *Burger King*, 471 U.S. at 475). It claims, quoting *Burger King,* that in order for a basis for jurisdiction to exist, Defendant's activities must create a "substantial connection" between itself and the forum state and that Plaintiffs cannot satisfy this burden. Defendant also argues that the Plaintiffs' claims fail to meet *Iqbal* and *Twombly's* plausibility standards. Finally, Defendant argues that the due process fairness inquiry weighs against an exercise of personal jurisdiction.

As noted *supra*, the Court's consideration of the motions to dismiss is confined to the pleadings, the Lukin affidavit, and arguments of counsel. As such, Defendants' merits arguments are premature, but their *Iqbal* argument warrants discussion.

The Court's analysis begins with the Complaint. Plaintiffs have alleged that CWVEC is a West Virginia corporation with a principal place of business in West Virginia; that Defendant MSC manufactures coke in its Follansbee, West Virginia facility; and that Defendant Severstal Russia is a Russian steel conglomerate. The Complaint sets forth facts that demonstrate a degree of inter-connectedness of all four Defendants' business relationships. Also alleged in detail are the specifics of the Coal Supply Agreement between CWVEC and MSC. The Complaint alleges that all three of the Severstal Defendants directed MSC to notify CWVEC that MSC was going to unilaterally (and in violation of the Coal Supply Agreement) reduce the amount of coal that it would accept for delivery during the first quarter of 2009. They have also alleged that MSC failed or refused to accept delivery of coal that it was contractually obligated to accept for contract year 2009 and did so at the

17

direction of the Severstal Defendants. Plaintiffs have alleged that they suffered harm and sustained damages as a consequence of Defendant's tortious conduct.

Under West Virginia law, a plaintiff makes out a *prima facie* case of tortious interference where plaintiff shows: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages. *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395, 403 (W. Va. 2008).

Some of Plaintiffs' allegations, when read in isolation from other parts of the Complaint, are broad and conclusory; however, reading the twenty-two page Complaint as a whole and remembering that the plausibility determination is a "context-specific" task, *Iqbal*, at 1950, the allegations are sufficient to set out a plausible personal jurisdictional claim. For example, Plaintiffs have described the Coal Supply Agreement in detail and have plausibly shown the existence of Severstal Russia's control over its subsidiary co-defendants. (Docket 97, ¶¶ 25-67.) Plaintiffs have explained the legal and business relationships among Defendants and their inter-connectedness with enough factual detail to permit the Court to reasonably infer that Severstal Russia directed MSC to breach its contract with CWVEC and did so wrongfully.

Defendants offer the Lukin affidavit in support of their challenge to the Court's exercise of personal jurisdiction. The Lukin affidavit states, among other matters, the following facts concerning the Defendants' relationship and actions relevant to this case:

**Defendant Severstal Russia**

Severstal Russia is not licensed to transact business and does not transact business in West Virginia; "does not own directly or maintain any offices, property, bank accounts, or other assets in West Virginia; does not have any employees residing in West Virginia; "does not

18

directly supply any goods or services to any purchasers located in West Virginia"; "does not solicit business and/or advertise in West Virginia"; "does not derive revenue from goods or services consumed in West Virginia." (Docket 33-2 ¶¶ 5-8.)

Severstal Russia does not purchase steel made by Severstal North America or Severstal Wheeling and does not "use" those companies' "property and assets as its own." (*Id.* ¶¶ 28, 30.)

Defendant Severstal Russia "does not directly own" Severstal North America or Severstal Wheeling stock or "directly own any membership interest in MSC." Severstal Russia does not "participate in the day-to-day operations" of those three companies. *Defendant Severstal Russia's oversight of these three companies "is limited to regular monitoring of those companies' activities, setting corporate policies, formulating and approving strategies (including business and operating plans), and approving significant transactions."* (*Id.* ¶¶ 20 26-27,33-34, 41.) (emphasis added).

Defendant Severstal Russia "does not exercise control over the decisions regarding the amount of coking coal to be delivered to [MSC], nor the delivery schedules for such coal." (*Id.* ¶ 42.)

**Defendant Severstal North America**

Defendant Severstal North America "engages in its own business with steel purchasers"; Severstal North America maintains its own books, files, corporate records, bank accounts; "owns its own assets"; "is responsible for its own financial performance under its credit arrangements"; pays its own expenses including employee salaries; has its own officer and director meetings. (*Id.* ¶¶ 21-24.)

**Defendant Severstal Wheeling**

One hundred percent of Defendant Wheeling's stock is owned by a holding company, Severstal US Holdings, LLC, which, in turn, is a subsidiary of Severstal International, one of three divisions of Severstal Russia; at the time this lawsuit was filed, only two of Severstal Russia's "officers and/or directors" served as "officers and/or directors" of Severstal US Holdings, LLC. or Defendants Severstal Wheeling and Severstal North America. (*Id.* ¶¶ 2, 11-12,19.)

Defendant Wheeling employees operate Defendant MSC's Follansbee, West Virginia manufacturing plant. (*Id.* ¶ 18.)

Severstal Wheeling "engages in its own business with steel purchasers"; maintains its own books, files, corporate records, bank accounts; "has its own officer and director meetings"; owns its own assets"; "is responsible for its own financial performance"; pays its own

19

expenses including employee salaries; has its own officer and director meetings.  (*Id.* ¶¶ 28-31.)

### Defendant Mountain State Carbon

MSC produces coke which has "historically been consumed by" Defendants Severstal Wheeling and Severstal North America.  (*Id.* ¶ 35.)

Defendant MSC is owned by Defendant Severstal Wheeling and SNA Carbon; SNA Carbon is a wholly-owned subsidiary of Defendant Severstal North America; MSC owns the Follansbee, West Virginia plant.  (*Id.* ¶ 18.)

MSC maintains its own books, files, corporate records, bank accounts; "has its own officer and director meetings";  owns its own assets"; "is responsible for its own financial performance."  (*Id.* ¶¶ 37-39.)

The Lukin affidavit does not show that Plaintiffs' allegations regarding the Court's personal jurisdiction over Severstal Russia are implausible. True, the Lukin affidavit states that Severstal Russia is not licensed to transact, and does not transact, business in West Virginia; nor does it have employees residing in the state. But, Mr. Lukin affirmatively states that, while Severstal Russia did not participate in the day-to-day operations of the other Defendants' businesses, it regularly monitored their activities, set their corporate policies, formulated and approved their business strategies and operating plans, and approved significant transactions. (Docket 33-2.) Nor does Mr. Lukin deny Plaintiffs' allegations that Severstal Russia directed MSC to take actions contrary to its contract with CWVEC.  Moreover, several of Mr. Lukin's averments are notably qualified.  For example, he states that Severstal Russia does not "directly" own property in West Virginia, does not "directly" supply goods or services to purchasers in the state, does not "directly" own shares of co-Defendants North America and Wheeling, and does not "directly" own a membership interest in MSC.  These tempered statements do little to shake the foundations of Plaintiffs' allegations that

Severstal Russia tortiously interfered in MSC's business relationship with CWVEC.   Thus, the Lukin affidavit does not cleanly contradict Plaintiffs' claims that Severstal Russia exercised complete control over its subsidiary co-Defendants—at least not sufficiently to dis-entitle Plaintiffs from having the Court assume the truthfulness of their allegations.   For these reasons, viewing the allegations in the light most favorable to Plaintiffs, and affording all reasonable inferences in favor of jurisdiction, the Court **FINDS** that Plaintiffs have satisfied the plausibility pleading standard.

Accordingly, the Court **DENIES** Defendant Severstal Russia's motion to dismiss Plaintiffs' Third Amended Complaint on the basis that the Court may not exercise personal jurisdiction of Severstal Russia [Docket 103.]

>    B.    *Severstal Defendants' Motions to Dismiss for Failure to State a Claim*

All three of the Severstal Defendants  contend that the Court must dismiss Counts VI and VII because the Complaint fails to plead sufficient facts to satisfy the pleading standards set forth in *Iqbal* and *Twombly*. (Docket 103, 105.)  They claim that Plaintiffs' allegations supporting an alter ego theory of liability are unsupported by facts showing that the companies disregarded corporate formalities or otherwise did not operate as separate legal entities.  (Docket 104, 121.)  Defendants also attack the legal merits of Plaintiffs' alter ego and tortious interference theories of liability. (*Id.*) In support of these arguments, Defendants rely, in part, on Mr. Lukin's affidavit.  (Docket 33-2.) As noted in the preceding discussion, that affidavit was filed in connection with Severstal Russia's motion to dismiss the Second Amended Complaint. (Docket 33.)

*(1)      The Propriety of Converting the Joint Motion to Dismiss to a Motion
for Summary Judgment*

The Court must first address the propriety of considering the Lukin affidavit in connection

with the Severstal Defendants' motions to dismiss for failure to state a claim.  The Severstal

Defendants make reference to the affidavit in their Rule 12(b)(6) arguments.  A motion to dismiss

for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil

complaint and is not a vehicle to decide the merits of a case.  Fed. R. Civ. P. 12(b)(6); *Schatz v.

Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991).  The court may "consider a document that a defendant

attaches to its motion to dismiss if the document was integral to and explicitly relied on in the

complaint and if the plaintiffs do not challenge its authenticity." *CACI Int'l, Inc. v. St. Paul Fire and

Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (internal quotations and citation omitted).  In

reviewing the sufficiency of a complaint a court may consider sources beyond the four corners of the

complaint, including "documents incorporated into the complaint by reference, and matters of which

a court may take judicial notice" or sources "whose accuracy cannot reasonably be questioned."

*Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (citation omitted).

When, however, a party presents other matters outside the pleadings to the court, and those

matters are not excluded, the court must treat the motion as one seeking summary judgment on the

pleadings and provide all parties a reasonable opportunity to present all pertinent material.  Fed. R.

Civ. P. 12(d).  "[F]ederal courts have complete discretion to determine whether or not to accept the

submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6)

motion and to rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C

Charles Wright, et al., *Federal Practice and Procedure* § 1366 (3d ed. 2004).

22

Here, the Lukin Affidavit was attached to Defendant Severstal Russia's motion to dismiss the Second Amended Complaint (Docket 33) in support of its contention that the Court lacked personal and subject matter jurisdiction.  It is significant that there is no indication that Plaintiffs explicitly relied on the Lukin Affidavit or incorporated that document by reference in their Third Amended Complaint.  Moreover, the Lukin Affidavit is plainly not the proper subject of judicial notice.  Unlike an insurance contract in a bad faith lawsuit or a deed in a property dispute, the Lukin affidavit is not a document that gave rise to the lawsuit; rather it is testimonial evidence offered by a Defendant in support of its theory of dismissal.  Although it is apparent (from the Complaint and from Plaintiffs' response to Defendants' motions to dismiss) that Plaintiffs agree with some of the matters stated in the Lukin Affidavit, it is equally apparent the parties are worlds apart regarding many factual matters.  As such, the Court cannot find that the affidavit's accuracy is uncontested.  For these reasons, the Court declines to consider the Lukin affidavit in connection with these motions to dismiss.   Additionally, the Court notes that Defendants have not sought summary judgment as an alternative remedy.  In light of the foregoing, as well as the complex factual disputes in this case, the Court declines to convert the joint motion to dismiss to a summary judgment motion.

### (2)        Motions to Dismiss Count VI — Alter Ego Claim

The Severstal Defendants' principal argument for dismissal of Count VI of Plaintiffs' Complaint is that Plaintiffs fail to state a *prima facie* alter ego case.  They state that they were not parties to the Coal Supply Agreement and cite case law for the proposition that parent corporations are generally not liable for the acts of the their subsidiaries as a matter of law.  (Docket 106, 121.) They claim that Plaintiffs' alter ego allegations are conclusory and unsupported by facts.  Plaintiffs contend that they have alleged sufficient facts establishing alter ego liability. (*Id.*)

Under West Virginia law, a corporate entity may be disregarded where the corporate form was used to perpetrate injustice, defeat public convenience, or justify wrongful or inequitable conduct. Syl. pt. 8, *Dieter Eng'g Servs., Inc. v. Parkland Dev., Inc.,* 483 S.E.2d 48 (W. Va. 1996). "A parental corporation is not necessarily liable for the acts of its subsidiary because of parental control. But if the control is absolute and the liquidation of the subsidiary is manipulated by the parent for its own purpose, in such manner as to prejudice a third person, the parent must answer therefor." Syl. pt., *First Huntington Nat'l Bank v. Guyan Machinery Co.*, 5 S.E.2d 532 (W. Va. 1939).

The "alter ego doctrines, alternatively 'instrumentality', 'identity', 'agency', 'piercing the corporate veil', or 'disregarding the corporate fiction[,]' are designed to prevent injustice when the corporate form is interposed to perpetrate an intentional wrong, fraud or illegality." *S. Elec. Supply Co. v. Raleigh Cty. Nat'l Bank*, 320 S.E.2d 515, 521-22 (W. Va. 1984). West Virginia's highest court characterized the alter ego doctrine as "complicated" and one to be applied "gingerly." *Id.* As that court explained, "the alter ego theory seeks access to shareholders' assets for corporate liabilities, whereas 'instrumentality' is generally employed to hold one corporation liable for the acts or contractual obligations of another corporation that is within its total control." *Id.* at 521-22  n.9 (citations omitted).

In *Southern States Co-Operative, Inc. v. Dailey*, 280 S.E.2d 821, 827 (W. Va. 1981), the Court stated:

> Justice may require that courts look beyond the bare legal relationship of the parties to prevent the corporate form from being used to perpetrate injustice, defeat public convenience or justify wrong.  However, the corporate form will never be disregarded lightly.  The mere showing that one corporation is owned by another or that they share common officers is not a sufficient justification for a court to

24

disregard their separate corporate structure. *Lipshie v. Tracy Inv. Co.*, 566 P.2d 819 (1977).  Nor is mutuality of interest, without the countermingling of funds or property interests, or prejudice to creditors, sufficient. *First National Bank v. Walton*, 262 P. 984 (1928).  Rather it must be shown that the corporation is so organized and controlled as to be a mere adjunct or instrumentality of the other. *Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2*, 596 P.2d 227 (1979); *Duplan Corp. v. Deering Milliken, Inc.*, 444 F. Supp. 648 (D.S.C.1977).

*Id.* (citations altered).

In deciding whether to pierce a corporate veil, many considerations may be relevant, such as:

[I]nadequacy of capital structures, whether personal and corporate funds have been commingled without regard to corporate form by a sole shareholder, whether two corporations have commingled their funds so that their accounts are interchangeable; whether they have failed to follow corporate formalities, siphoning funds from one corporation to another without regard to harm caused either entity, or failed to keep separate records . . . total control and dominance of one corporation by another or a shareholder; existence of a dummy corporation with no business activity or purpose; violation of law or public policy; a unity of interest and ownership that causes one party or entity to be indistinguishable from another; common shareholders, common officers and employees, and common facilities.

This evidence must be analyzed in conjunction with evidence that a corporation attempted to use its corporate structure to perpetrate a fraud or do grave injustice on an innocent third party seeking to "pierce the veil."

*S. Elec. Supply Co.,* 320 S.E.2d at 523 (citations omitted).

"While the law presumes that two separately incorporated businesses are distinct entities, this presumption can be disregarded when the corporate form is being used to perpetrate injustice, defeat public convenience, or justify wrongful or inequitable conduct." *W. Va. Highlands Conservancy, Inc. Public Serv. Comm'n*, 527 S.E.2d 495, 502 (W. Va. 1998) (citation omitted).  In *Laya v. Erin Homes, Inc.*, 352 S.E.2d 93, 98 (W. Va. 1986)—a breach of contract case involving the question of whether to pierce a corporate veil in order to hold shareholders who actively participated in the

business operations liable—the court identified nineteen factors to be considered in the corporate

veil piercing inquiry. Those factors are:

(1)    commingling of funds and other assets of the corporation with those of the individual shareholders;

(2)    diversion of the corporation's funds or assets to noncorporate uses (to the personal uses of the corporation's shareholders);

(3)    failure to maintain the corporate formalities necessary for the issuance of or subscription to the corporation's stock, such as formal approval of the stock issue by the board of directors;

(4)    an individual shareholder representing to persons outside the corporation that he or she is personally liable for the debts or other obligations of the corporation;

(5)    failure to maintain corporate minutes or adequate corporate records;

(6)    identical equitable ownership in two entities;

(7)    identity of the directors and officers of two entities who are responsible for supervision and management (a partnership or sole proprietorship and a corporation owned and managed by the same parties);

(8)    failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking;

(9)    absence of separately held corporate assets;

(10)    use of a corporation as a mere shell or conduit to operate a single venture or some particular aspect of the business of an individual or another corporation;

(11)    sole ownership of all the stock by one individual or members of a single family;

(12)    use of the same office or business location by the corporation and its individual shareholder(s);

(13)    employment of the same employees or attorney by the corporation and its shareholder(s);

(14)    concealment or misrepresentation of the identity of the ownership, management or financial interests in the corporation, and concealment of personal business activities of the shareholders (sole shareholders do not reveal the association with a corporation, which makes loans to them without adequate security);

(15)    disregard of legal formalities and failure to maintain proper arm's length relationships among related entities;

(16)    use of a corporate entity as a conduit to procure labor, services or merchandise for another person or entity;

(17)    diversion of corporate assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, or the manipulation of assets and liabilities between entities to concentrate the assets in one and the liabilities in another;

(18)    contracting by the corporation with another person with the intent to avoid
         the risk of nonperformance by use of the corporate entity; or the use of a
         corporation as a subterfuge for illegal transactions;

(19)    the formation and use of the corporation to assume the existing liabilities of
         another person or entity.

*Id.* 347-48 (footnote omitted).

An alter ego theory is not easily proved and the burden lies with the party asking a court to find "exceptional circumstances" justifying disregard of a corporate structure. *Id.* "A corporate shield may be 'pierced' to make a corporation liable for behavior of another corporation within its total control. But decisions to look beyond, inside and through corporate facades must be made case-by-case, with particular attention to factual details." *Id.* (citation footnote omitted). The law presumes that two separately incorporated businesses are separate entities and that corporations are separate from their shareholders. *Id.* (citation footnote omitted).

Based on the foregoing legal principles, it is apparent that Plaintiffs will have a tall order to fill in proving the merits of their alter ego theory of liability. Here, however, the Court's task is not to evaluate whether Plaintiffs have proved the merits of its case beyond a preponderance of the evidence, but rather to assess whether the Plaintiffs have shown a *plausible* cause of action under the *Iqbal* and *Twombly* standards. Those standards, as noted *supra*, require the Court to determine whether the Complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; that is, whether the Plaintiffs have pleaded sufficient, non-conclusory factual content to allow the Court to draw the reasonable inference that the Defendants are liable for the misconduct alleged. In their twenty-two page Complaint, Plaintiffs allege, among other matters, that:

•    Severstal Wheeling is a is a wholly-owned subsidiary of Severstal North America;

27

- MSC has no employees;

- MSC's Follansbee plant is "managed and operated exclusively by employees of Severstal Wheeling and/or Severstal [North America];

- Severstal North America was formed "to act as the U.S. domestic arm of Severstal Russia through which its U.S. Steel operations, including Severstal Wheeling and [MSC], were operated and controlled;

- Severstal Russia "exercises complete control and dominion over the affairs"of Severstal North America including "the price for commodities and the determination of operating budgets";

- Severstal North America, in turn, "exercises complete control and dominion over the affairs" of Severstal Wheeling and MSC, including setting the price that MSC will pay for coal, determining the amount and scheduling of coal delivered to MSC, the amount of coke MSC produces and ships, and determining capital expenditures for the maintenance of MSC's facilities;

- the Severstal Defendants "make all corporate decisions relating to [MSC's] business operations, including its performance under the Coal Supply Agreement" and that these decisions are made or implemented by Severstal Wheeling and its officers and employees";

- All Defendants were aware that Plaintiffs relied upon MSC's contractually required written notice to CWVEC of its annual coal requirements so that Plaintiffs could prepare their annual operating budgets and manage their business operations;

- In June and July of 2008, MSC "was notified by its parent and affiliate companies that orders for steel products appeared to be declining or were about to decline precipitously";

- By late August and early September 2008, "representatives of Severstal Russia and their U.S. subordinates" had a series of meetings;

- The Severstal Defendants directed MSC to notify CWVEC that MSC was going to unilaterally reduce the amount of coal that it would accept for delivery during the first quarter of 2009;

- MSC "pursuant to the instructions of Severstal Russia and Severstal [North America]" sent the October 31, 2008, letter to CWVEC notifying it that MSC required 1,128,000 tons of coal for the 2009 contract year;

- MSC failed or refused to accept delivery of coal that it was contractually obligated to accept for contract year 2009 and did so at the direction of the Severstal Defendants.

Several of these allegations, standing in isolation of one another, are undeniably broad assertions. For example, Plaintiffs assert "Severstal North America was formed "to act as the U.S. domestic arm of Severstal Russia through which its U.S. Steel operations, including Severstal Wheeling and [MSC], were operated and controlled," and Severstal Russia "exercises complete control and dominion over the affairs"of Severstal North America, and Severstal North America "exercises complete control and dominion over the affairs" of Severstal Wheeling and MSC. The Court, however, cannot conclude that Plaintiffs' allegations, when read together, lack sufficient factual detail. Plaintiffs provide several examples of the control the Severstal Defendants allegedly exerted, namely, control over Severstal North America's price for commodities and the determination of its operating budgets; that Severstal North America exerted control over setting the price that MSC will pay for coal, determining the amount and scheduling of coal delivered to MSC, the amount of coke MSC produces and ships, and determining capital expenditures for the maintenance of MSC's facilities. Other allegations are unquestionably factually specific and relevant to Plaintiffs' theory of liability (for example, in June and July of 2008, MSC "was notified by its parent and affiliate companies that orders for steel products appeared to be declining or were about to decline precipitously;" "the Severstal Defendants directed MSC to notify CWVEC that MSC was going to unilaterally reduce the amount of coal that it would accept for delivery during the first quarter of 2009;" MSC "pursuant to the instructions of Severstal Russia and Severstal [North America]" sent the October 31, 2008, letter to CWVEC notifying it that MSC required 1,128,000 tons of coal for the 2009 contract year and MSC failed or refused to accept delivery of coal that it

29

was contractually obligated to accept for contract year 2009 and did so at the direction of the Severstal Defendants.

The Severstal Defendants vigorously argue the merits of an affirmative defense to Plaintiffs' alter ego and tortious interference claims. They cite well-settled case law for the proposition that parent corporations are generally not liable for the acts of their subsidiaries and emphasize various favorable factors from West Virginia case law. The West Virginia Supreme Court of Appeals has characterized the alter ego doctrine as one involving "complicated factual proofs." *S. Elec. Supply Co.*, 320 S.E.2d at 522 n.5. Because the doctrine is complex, that Court has stated that questions involving such matters are generally inappropriate even for summary judgment. *Id.* The Court recognizes that the Severstal Defendants' arguments potentially may have force at the merits stage of this case, but because the alter ego claim and the affirmative defenses will involve complex factual issues, and because "all facts necessary" to the affirmative defense do not clearly appear on the face of the complaint, the Court declines, at this juncture, to give much consideration to the Defendants' affirmative defense. *Goodman v. Praxair, Inc.*, 494 F.3d at 464.

Returning to the appropriate subject of the Court's attention—the sufficiency of Plaintiffs' pleadings—the Court notes that the heart of Plaintiffs' alter ego claim is a contention that the Severstal Defendants acted wrongfully, fraudulently, or illegally when it directed MSC to violate its contract with CWVEC. Under West Virginia law, the alter ego theory is an equitable theory designed to prevent injustice by misuse of the corporate form. Whether Plaintiffs may prove by a preponderance of the evidence that the Severstal Defendants in fact acted in the manner alleged and, if so, whether the Defendants can prove that their action was justified or was within their legal rights to do, are matters for another day. For the reasons set forth above, the Court **FINDS** that the

30

Plaintiffs have shown a plausible alter ego claim and **DENIES** Defendants Severstal Wheeling, Severstal North America, and Severstal Russia's motions to dismiss Counts VI for failure to state a claim [Docket 103, 105] as they relate to Count VI of the Complaint.

*(3)      Motions to Dismiss Count VII — Tortious Interference Claim*

As previously discussed, under West Virginia law, to establish *prima facie* proof of tortious interference, a plaintiff must show:

(1)      existence of a contractual or business relationship or expectancy;
(2)      an intentional act of interference by a party outside that relationship or expectancy;
(3)      proof that the interference caused the harm sustained; and
(4)      damages.

*Hatfield*, 672 S.E.2d at 403.

Once a plaintiff alleges a *prima facie* case, a defendant may assert the affirmative defenses of justification or privilege. *Id.* "Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper." *Id.* "[I]n order for a party to be held liable for intentional interference with a contractual relationship, the party must be someone outside of the contractual relationship." *Id.*

The reasoning set forth *supra* for denying Defendant Severstal Russia's motion to dismiss for lack of personal jurisdiction applies with equal force here and need not be repeated. Reading the twenty-two page Complaint as a whole, Plaintiffs have alleged a plausible, non-speculative facts that permit the Court to infer that the Severstal Defendants are liable for tortiously interfered with

CWVEC's contractual relationship with MSC under West Virginia law. The Court **DENIES** Defendants, Severstal Wheeling, Severstal North America, and Severstal Russia's motions to dismiss Cout VII for failure to state a claim [Docket 103, 106] as they relate to Count VII of the Complaint.

### IV.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant Severstal Russia's motion to dismiss [Docket 103], **DENIES** Defendant Severstal Wheeling, Inc. and Defendant Severstal North America's joint motion to dismiss Counts VI and VII [Docket 105].

Also pending are three renewed motions to dismiss the Second Amended Complaint by former defendant SNA Carbon, LLC, Defendant Severstal North America, Inc. and Defendant Severstal Russia.  [Docket 85, 87, & 89.]   Because these motions relate to the Second Amended Complaint and because SNA Carbon, LLC is no longer a party to this suit, these motions are **DENIED AS MOOT**.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        March 30, 2012

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE